1

2

3

4

5

6

7

8                  UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No. 2:24-cv-00925-DJC-DB

12              Plaintiff,

13        v.                                **ORDER**

14   CALIFORNIA DEPARTMENT OF
     CORRECTIONS AND
15   REHABILITATION,

16              Defendant.

17

18        After the experience of the COVID-19 pandemic, Defendant California

19   Department of Corrections and Rehabilitation ("CDCR") began more rigorously

20   enforcing state laws requiring respirators to be used when Correctional Officers are

21   exposed to airborne diseases such as COVID-19 and the chemical agents that are

22   often used to respond to inmate disturbances, cell extractions, and on less frequent

23   occasions, riots.  As a result of the type of respirators CDCR selected to meet its

24   needs, Correctional Officers donning a respirator are not permitted to wear most

25   types of beards, as the California Division of Occupational Safety and Health

26   ("Cal/OSHA") guidelines do not allow facial hair that breaks the seal of the respirator

27   on the user's face.  Because, in CDCR's view, all Correctional Officers must be

28

1   prepared to don a respirator as part of their job duties, CDCR prohibits all

2   Correctional Officers from maintaining most types of beards.

3       Defendant's facial hair policy is in conflict with the sincerely held religious

4   beliefs of some of its Correctional Officers, who maintain beards as an expression of

5   their faith.  Generally speaking, Title VII of the Civil Rights Act of 1964 prohibits

6   employers from discriminating against any individual with respect to their religion and

7   requires employers to provide reasonable accommodations to the religious beliefs of

8   employees unless doing so would constitute an undue hardship.  Recently, the

9   Supreme Court clarified that to show an undue hardship, an entity must show that the

10  burden of granting an accommodation would result in a substantial increased cost for

11  the employer in relation to the conduct of the employer's particular business.  *Groff v.*

12  *DeJoy*, 600 U.S. 447, 470 (2023).

13      Several Correctional Officers, including the Charging Parties in this case,

14  sought a religious accommodation to permit them to wear a beard while serving as a

15  Correctional Officer.  After being denied an accommodation, the Charging Parties

16  filed complaints with the Equal Employment Opportunity Commission ("EEOC"),

17  which began an investigation into CDCR's employment practices.  After completing an

18  initial investigation, the EEOC concluded that a preliminary injunction prohibiting

19  CDCR from requiring Correctional Officers to shave in violation of their religious

20  beliefs was necessary, and the Attorney General brought this action in order to

21  prevent further harm to the Charging Parties while the EEOC completes its

22  investigation and reaches a final disposition of the charges.

23      Having reviewed the evidence in this case, the Court concludes that Defendant

24  has not presented sufficient evidence to support its contention that allowing *any*

25  Correctional Officer to maintain a beard in *any* position across its institutions would

26  constitute an undue hardship.  The Court does not reach this conclusion lightly: CDCR

27  is rightly concerned about placing its Correctional Officers and inmates at

28  unnecessary risk of contracting COVID-19 or other airborne diseases, and

1  Correctional Officers must be able to use respirators in response to the use of

2  chemical agents when required by state law.  CDCR has not demonstrated, however,

3  that it would be an undue hardship to modify its policy decision to require all

4  Correctional Officers to be able to respond to the use of chemical agents.  Nor has it

5  established that all Correctional Officers must be able to wear a respirator in all

6  situations to avoid exposure to airborne diseases like COVID-19.

7        In support of its position that all Correctional Officers be able to respond to

8  inmate disturbances that involve chemical agents, Defendant points to the fact that in

9  2023 alone, there were 5,000 use-of-force incidents where chemical agents were

10  used.  But this argument ignores the fact that for many of these incidents, respirators

11  weren't used because Correctional Officers were responding to an unplanned

12  situation that required an immediate use of force, such as two inmates fighting.

13  Defendant does not provide any information on how often respirators were actually

14  used in 2023.  Given that at least two of the Charging Parties have *never* used a

15  respirator despite having worked at CDCR for eight and six years respectively, some

16  specific evidence of how often respirators are actually used in CDCR institutions is

17  necessary for Defendant to show that exempting some Correctional Officers would

18  result in substantial increased costs.

19        Similarly, while respirators may be used in some prison facilities to protect

20  against airborne diseases such as COVID-19, Defendant fails to offer any evidence

21  about the frequency with which respirators are used for this purpose.  It is certainly the

22  case that *some* Correctional Officers are required to use a respirator in some portions

23  of the prisons, such as medical facilities, or in response to an outbreak of an infectious

24  disease.  But without important information, such as how often this occurs, the Court

25  cannot conclude it is reasonable to require all Correctional Officers to shave at all

26  times.

27        It may well be that it would be an undue hardship for CDCR to grant an

28  exception to its facial hair policy for each of the Correctional Officers who request it.

1   Its categorical refusal to allow *any* exemption to that policy on the grounds that it

2   would be an undue hardship, however, is not supported by the evidence.  CDCR must

3   meaningfully engage in the process required by Title VII to accommodate its

4   Correctional Officers in the exercise of their religious beliefs.  Accordingly, the Court

5   will grant Plaintiff's requested relief.

6                                          **BACKGROUND**

7          Defendant enforces a policy prohibiting all Correctional Officers in Defendant's

8   employ from having certain types of facial hair that prevent the respirators CDCR uses

9   from creating a complete seal to the face of the user or interfere with valve functions

10  of the respirators.  (Mot. (ECF No. 8) at 5; Opp'n (ECF No. 17) at 6.)  This policy is

11  designed to limit Correctional Officers' exposure to chemical agents and Aerosol

12  Transmissible Diseases ("ATDs") – such as COVID-19 – when the use of a respirator is

13  required.  Under Defendant's policies, all Correctional Officers must be able to wear a

14  respirator, such that it is necessary, in Defendant's view, that Correctional Officers

15  shave facial hair that would interfere with the seal or valve functions of the respirators.

16  (*Id.*)

17         Prior to the COVID-19 pandemic, Defendant did not strictly enforce a facial hair

18  requirement and had granted religious accommodations to a number of Correctional

19  Officers, permitting them to wear beards as part of their religious practice.  In part due

20  to a settlement with Cal/OSHA, Defendant modified its policies in 2022 to the current

21  facial hair policy.  (Opp'n at 3.)  On September 22, 2022, CDCR issued a

22  memorandum wherein Correctional Officers were informed they would need to be

23  able to pass a "fit test" to ensure that any facial hair did not affect the seal of a

24  respirator to the face or the valve functions of a respirator.  (Sienko Decl. (ECF No. 8-2)

25  Ex. 6.)  The memorandum also informed Correctional Officers that previously

26  submitted and granted religious accommodation requests would need to be

27  resubmitted and reevaluated.

28

                                                    4

Between May and September 2023, the United States Equal Employment Opportunity Commission received charges from a number of individuals currently or previously employed by Defendant as Correctional Officers alleging that Defendant had engaged in religion-based discrimination by enforcing the facial hair policy.  This included Mubashar Ali, Ravinder Dhaliwal, Jatinder Dhillon, Amarpreet Pannu, Adam Quattrone, Rajdeep Singh, Satvir Singh, and Manroop Singh Sohal (collectively, the "Charging Parties").  The EEOC is presently investigating these charges.  On February 6, 2024, the EEOC notified the United States Attorney General that "prompt judicial action" in the form of injunctive relief was necessary pending a final determination as to the Charging Parties' complaints. (Mot. at 10.)  On March 11, 2024, Plaintiff notified Defendant of the eight charges from the Charging Parties and requested that Defendant immediately cease enforcement of the policy. (*Id.*)  On March 21, 2024, Defendant denied Plaintiff's request to cease enforcement. (*Id.*)

Plaintiff filed the present suit and the subsequent motion for preliminary relief with the express purpose of obtaining preliminary relief until the EEOC issues a final disposition of the charges.  This motion is fully briefed (Mot. (ECF No. 8); Opp'n (ECF No. 17); Reply (ECF No. 20); Sur-Reply (ECF No. 25-1)[1]) and the Court heard oral argument on June 6, 2024 (*see* ECF No. 28).

**LEGAL STANDARD**

Title VII, Section 706 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, empowers the EEOC to prevent employers from engaging in unlawful employment practices.  Under Section 706, individuals who are subject to discriminatory practices may file charges of such discrimination with the EEOC.  42 U.S.C. § 2000e-5(b).  If, after a preliminary investigation of a charge, the EEOC determines that "prompt judicial action is necessary to carry out the purposes of [the Civil Rights Act]," the

---

[1] At oral argument the Court overruled Defendant's Objections to the evidence submitted in support of Plaintiff's Sur-Reply but permitted Defendant's Sur-Reply.  Accordingly, the Court grants Defendant's request to submit Sur-Reply.  The Proposed Sur-Reply filed at ECF No. 25-1 will be deemed filed and added to the Docket as Defendant's Sur-Reply.

EEOC may "bring an action for appropriate temporary or preliminary relief pending final disposition of such charge." 42 U.S.C. § 2000e-5(f)(2). Where, as is the case here, the employer is a government agency, this is done by the Attorney General instead of the EEOC itself. *Id.* Subsection (f)(2) of Section 706 also provides that preliminary relief under that section "be issued in accordance with rule 65 of the Federal Rules of Civil Procedure." *Id.*

The Supreme Court recently issued a decision in *Starbucks Corp. v. McKinney*, --- U.S. ---, 2024 WL 2964141 (2024), in which the Court made clear that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Id.* at *4. In the context of preliminary relief, this means courts must apply the full four-part test described in *Winter v. Natural Resource Defense Council*, 555 U.S. 7 (2008). The only exception is where there has been "a clear command from Congress" to depart from the traditional *Winter* factors. *Starbucks Corp.*, 2024 WL 2964141 at *4.

Section 706(f)(2) does not contain a clear command from Congress to depart from *Winter*. In fact, as already noted, it expressly states that "[a]ny temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure." 42 U.S.C. § 2000e-5(f)(2). Given that Section 706(f)(2) does not provide a clear command to apply a different standard, the Court must fully consider the traditional four-factor test described in *Winter*. The *Winter* test requires that a party seeking preliminary injunctive relief show (1) they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *See Starbucks Corp.*, 2024 WL 2964141 at *4. The Court will consider each factor in turn.

////

////

**DISCUSSION**

**I.     Likelihood of Success on the Merits**

Plaintiff brings this action based on Defendant's alleged failure to accommodate the Charging Parties' religious beliefs in violation of Section 703(a)(1) of Title VII.  *See* 42 U.S.C. § 2000e-2(a)(1).  That subsection makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  *Id.*  Unlawful employment practices include the failure to reasonably accommodate an employee's religious beliefs, practices, and observances unless doing so would constitute an undue hardship.  42 U.S.C. § 2000e(j) (defining religion); *see also Groff*, 600 U.S. at 453–54.

In analyzing a Title VII failure-to-accommodate claim, courts in the Ninth Circuit apply a burden shifting framework.  *See Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006).  This requires that a plaintiff "must first set forth a prima facie case that: (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement."  *Id.* (internal quotations and citations omitted).  After the plaintiff meets this prima facie requirement, the burden then shifts back to the defendant to show that they "initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship."  *Peterson v. Hewlett–Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004).

**A.  Prima Facie Case**

Plaintiff has met its initial burden in presenting a prima facie failure-to-accommodate case for all Charging Parties.

1       Each of the Charging Parties has submitted declarations to the Court in which

2   they represent that they have sincerely held religious beliefs that require them to

3   maintain facial hair.  (Ali Decl. (ECF No. 8-3) ¶ 1; Dhaliwal Decl. (ECF No. 8-4) ¶ 1;

4   Dhillon Decl. (ECF No. 8-5) ¶ 1; Pannu Decl. (ECF No. 8-6) ¶ 1; Quattrone Decl. (ECF

5   No. 8-7) ¶ 1; R. Singh Decl. (ECF No. 8-8) ¶ 1; S. Singh Decl. (ECF No. 8–9) ¶ 1; Sohal

6   (ECF No. 8-10) ¶ 1.)  "An assertion of a sincere religious belief is generally

7   accepted . . . ."  *Keene v. City and County of San Francisco*, No. 22-16567, 2023 WL

8   3451687, at *2 (9th Cir. May 15, 2023) (citing *Thomas v. Review Bd.*, 450 U.S. 707, 714

9   (1981) and *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176 n.3 (9th Cir.

10  2021)).  Defendant does not contest the sincerity of the Charging Parties' religious

11  beliefs, nor does the Court have any cause to doubt them. [2]

12      Defendant does not contest that the Charging Parties each made Defendant

13  aware of their religious beliefs and the conflict between those beliefs and their

14  employment duty.  All but one of the Charging Parties assert that they submitted

15  requests for religious accommodations to permit them to maintain their facial hair, in

16  some cases submitting multiple such requests.  (Ali Decl. ¶¶ 4, 9.b; Dhaliwal Decl.

17  ¶¶ 3, 6.a, 6.c; Pannu Decl. ¶ 7.c; Quattrone Decl. ¶¶ 4, 8; R. Singh Decl. ¶¶ 3, 6, 16; S.

18  Singh Decl. ¶¶ 6.a, 8; Sohal Decl. ¶ 5.a.[3])  The sole Charging Party who did not submit

19  a request for religious accommodation, Jatinder Dhillon, states that he requested his

20  attorney submit a letter to "CDCR Assistant Secretary/General Counsel on my behalf

21  reiterating my request of an accommodation to the clean-shaven policy . . ." based on

---

[2] During argument, Defendant's counsel also suggested that permitting religious accommodations from the facial hair requirement would result in more Correctional Officers claiming their religious beliefs prevent them from shaving.  The implication of the statement appeared to be that these individuals would falsely claim religious beliefs in order to avoid the respirator requirement.  This claim appears to be entirely without basis.  This is an inappropriate suggestion without concrete evidence of such a risk and the statement represents a concerning approach to requested religious accommodations in a case where the Charging Parties all appear to have genuinely held religious beliefs.

[3] Due to an apparent drafting error, the Declaration of Charging Party Manroop Singh Sohal contains repeated paragraph numbers.  (*See* Sohal Decl. at 1–2.)  To avoid confusion, the Court refers to paragraphs from this declaration by what would be the appropriate paragraph number, not what appears in the declaration.

1    his religious beliefs.  (Dhillon Decl. ¶ 12; Dhillon Decl. Ex. 33.)  The requests for

2    accommodation described by the Charging Parties – as well as those attached by

3    several of the Charging Parties as exhibits to their declarations (*see* Ali Decl. Ex. 18 &

4    20; Dhaliwal Decl. Ex. 24 & 25; Pannu Decl. Ex. 35; Quattrone Decl. Ex. 43; R. Singh

5    Decl. Ex. 47; S. Singh Decl. Ex. 52 & 53; Sohal Decl. Ex. 55) – are sufficient to show the

6    Charging Parties each informed Defendant of their religious beliefs and conflict.  *See*

7    *Berry*, 447 F.3d at 655 (finding an employee informed their employer of their religious

8    beliefs and conflict by requesting to be relieved from a restriction on discussing

9    religion with clients).[4]

10        Each of the Charging Parties claims that they were threatened with or suffered

11    adverse employment actions because of their inability to fulfill the job requirement.

12    (Ali Decl. ¶ 11; Dhaliwal Decl. ¶¶ 6.b, 8, 10; Dhillon Decl. ¶ 6.c; Pannu Decl. ¶¶ 13–15;

13    Quattrone Decl. ¶¶ 10, 12; R. Singh Decl. ¶¶ 7, 18; S. Singh Decl. ¶ 6.b; Sohal Decl.

14    ¶ 5.d, 7.)  The threatened or actual action taken against the Charging Parties differ in

15    kind and severity including being sent home from work and told not to return until

16    they had shaved (*see, e.g.*, Ali Decl. ¶ 11), being told to either withdraw the

17    accommodation request or take a demotion (*see, e.g.*, Dhaliwal Decl. ¶ 6.b), and

18    being threatened with termination (*see, e.g.*, S. Singh Decl. ¶ 6.b).  However, all of the

19    alleged actions, whether threatened or actual, fall within the realm of adverse

20    employment action.  *See Berry*, 447 F.3d at 655 (finding a prima facie showing of

21    adverse employment action was satisfied based on a supervisor "instructing" an

22    employee "not to pray with or proselytize to clients").  Defendant, again, does not

---

25    [4] Each of the Charging Parties took different steps in seeking an accommodation.  As such, there may
26    be technical issues with the way in which some of the accommodation requests were presented to
      CDCR.  However, in each case it is clear CDCR was made aware of each Correctional Officer's desire to
27    wear a beard as a religious accommodation.  In any event, the similarity of CDCR's responses, as well as
      the existence of what appears to be guidance from CDCR's Office of Civil Rights on this issue, (*see, e.g.*,
      Aviles Decl. Ex. E; Ourique Decl. (ECF No. 17-6), Ex. A at 4–5 [ECF No. 17-6 at 8–9]), convinces the Court
28    that the Plaintiff has set forth a prima facie case of an unlawful employment practice.

contest that the Charging Parties were threatened with or suffered actual adverse employment actions.

Plaintiff has clearly shown that they can meet their burden to establish a prima facie Title VII failure-to-accommodate case as they have presented evidence that the Charging Parties had bona fide religious beliefs that conflicted with the facial hair policy, that the Charging Parties informed Defendant of their beliefs and the policy conflict, and that the Charging Parties faced adverse employment actions.

### B. Good Faith Efforts to Accommodate or Undue Hardship

Given that Plaintiff has shown the existence of a prima facia case, the burden then shifts to Defendant. Defendant must show that it "initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Berry*, 447 F.3d at 655. The Defendant is unable to make either showing in this case.

### 1. Reasonable Accommodations

To satisfy Title VII, an accommodation of an individual's religious practices must "reasonably preserve that employee's employment status, i.e., compensation, terms, conditions, or privileges of employment." *Am. Postal Workers Union, S.F. Loc. v. Postmaster Gen.*, 781 F.2d 772, 776 (9th Cir. 1986). This burden "lies with the employer", meaning the *employer* must propose an accommodation. *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988). "Where an employer proposes an accommodation which effectively eliminates the religious conflict faced by a particular employee, however, the inquiry under Title VII reduces to whether the accommodation reasonably preserves the affected employee's employment status." *Am. Postal Workers Union*, 781 F.2d at 776–77.

The record shows that initially, many of the Charging Parties were expressly informed that Defendant could not provide any accommodations for them. (Ali Decl. Ex. 21, at 1 [ECF No. 8-3 at 21] ("[I]t has been determined that [CDCR] is unable . . . to identify a reasonable accommodation that does not create an undue hardship . . . .");

1  Dhaliwal Decl. Ex. 25, at 2 [ECF No. 8-4 at 12] ("cannot accommodate"); Pannu Decl.

2  Ex. 35, at 3 [ECF No. 8-6 at 12] ("[W]e were unable to provide an accommodation for

3  the classification of Correctional Peace Officer[.]").)  On or about November 2, 2022,

4  CDCR's Office of Civil Rights issued internal guidance on accommodations that could

5  be considered in responding to requests for exemption from the facial hair

6  requirement.  (*See* Aviles Decl. (ECF No. 17-2) at 3; Aviles Decl. Ex. E.)  After this

7  guidance was issued, Charging Parties making religious accommodation requests

8  were offered "reassignment/transfer and/or demotion" as an accommodation and, in

9  some cases, a limited leave of absence.  (*See, e.g.*, Ali Decl. Ex. 23; Pannu Decl. Ex. 39;

10  R. Singh Decl. Ex. 49.)

11      Defendant contends that reassignment, transfer, or demotion represent

12  reasonable accommodations for the Charging Parties and that Defendant remains

13  willing to provide them those purported accommodations.  (Opp'n at 9–10.)

14  Defendant claims that it was the Charging Parties' decision to disengage from the

15  interactive process that resulted in Defendant's inability to provide reasonable

16  accommodations.  (*Id.* at 11.)  However, for a proposed accommodation to satisfy Title

17  VII, the accommodation must "reasonably preserve that employee's employment

18  status, i.e., compensation, terms, conditions, or privileges of employment."  *Am. Postal*

19  *Workers Union*, 781 F.2d at 776.

20      A demotion would plainly not preserve the Charging Parties' employment

21  status.  Further, while it is theoretically possible that a "reassignment/transfer" could

22  serve as a reasonable accommodation, this would likely only be true if the Charging

23  Parties were transferred to another position within the Peace Officer classification

24  given that non-Peace Officer positions apparently provide lower pay, lesser retirement

25  benefits, and other less favorable conditions of employment.  (*See* Mot. at 6; *see also*

26  Ali Decl. ¶ 14; Dhaliwal Decl. ¶ 6.b; Pannu Decl. ¶ 19; Quattrone Decl. ¶ 14; R. Singh

27  Decl. ¶ 22; S. Singh Decl. ¶ 7.)  The loss of such compensation and privileges of

28

1  employment would represent a change in the Charging Parties' employment status.

2  *See Am. Postal Workers Union*, 781 F.2d at 776.

3        The Charging Parties understood the transfers offered to be to non-Peace

4  Officer positions. (*See, e.g.*, Ali Decl. ¶ 14; Sohal Decl. ¶ 5.d; Quattrone ¶ 14.)  In

5  some instances, a Charging Party was directed to the "Cal Careers" website to

6  determine what available positions they were interested in but, when the Charging

7  Party investigated, they did not find any Peace Officer positions and/or were rejected

8  from the available Peace Officer positions. (Pannu Decl. ¶ 18–19; Pannu Decl. Ex. 39;

9  Dhaliwal Decl. ¶ 8; Dhaliwal Ex. 27.)

10        Defendant's suggestion that there *might* be Peace Officer positions available is

11  insufficient.  Defendant provides no guarantee that these positions are available to the

12  Charging Parties, instead simply suggesting that such a transfer is *possible* based on a

13  single instance where an individual was successfully transferred to a Parole Officer

14  position. (Opp'n at 23.)  This singular transfer does not establish that such positions

15  are actually available for the Charging Parties.  As is tacitly noted in one declaration

16  submitted by Defendant with their Opposition, the ability to transfer to such a position

17  is limited due to the need for a Peace Officer position to be vacant, the individual to

18  be appropriately qualified for the position, and for the vacant position to not result in

19  a pay increase for the individual.  (*See* Mack Decl. (ECF No. 17-16) ¶ 5 ("*If qualified*,

20  that CO could be transferred to a different, *vacant* peace-officer job with different

21  essential functions, such as Parole Agent or Special Agent *so long as the transfer does*

22  *not result in a pay increase*." (emphasis added).)  Moreover, as noted above, in some

23  instances, the Charging Parties investigated the vacant positions and discovered that

24  Peace Officer positions were not available. (*See, e.g.,* Pannu Decl. ¶ 18–19; Pannu

25  Decl. Ex. 39; Dhaliwal Decl. ¶ 8; Dhaliwal Decl. Ex. 27.)

26        Defendant's suggestion that the Charging Parties did not receive reasonable

27  accommodations because they disengaged from the interactive process is not

28

1  supported by the record in most instances.[5]  Once Defendant made it clear to a

2  Charging Party that they would only be offered a demotion or transfer/reassignment

3  that would represent a change in employment status, that individual's continued

4  involvement in that process is immaterial as it could not result in a reasonable

5  accommodation.

6         In short, while theoretically in some situations Defendant might have positions

7  into which the Charging Party could be transferred that would maintain that

8  individual's employment status, Defendant makes no showing that such options are

9  actually available.  It is clear that in reality the offered accommodations represented a

10  change in employment status as Defendant was unwilling to provide Charging Parties

11  with accommodations that were not a demotion or transfer to a non-Peace Officer

12  position.  Defendant does not represent that any other efforts were made to

13  accommodate the Charging Parties.  As such, Defendant did not initiate good faith

14  efforts to accommodate reasonably the Charging Parties religious practices.[6]  *See*

15  *Berry*, 447 F.3d at 655.

16         **2.  Undue Hardship**

17         Having failed to accommodate the Charging Parties' religious practices,

18  Defendant must show that providing reasonable accommodations would create

19  undue hardship for CDCR.  42 U.S.C. § 2000e(j).  It has not done so.

20         The Supreme Court recently clarified the standard for undue hardship under

21  Title VII in *Groff v. DeJoy*, 600 U.S. 447 (2023).  There, the Court explained that to

22  _____

23  [5] Examining the declarations submitted by both parties, it seems that Charging Party Satvir Singh may
   have prematurely disengaged from the interactive process by failing to speak with the Equal

24  Employment Opportunity Coordinator at his institution after he submitted his initial religious
   accommodation request, despite the Coordinator attempting to meet with Charging Party Satvir Singh
   and his counsel.  (*See* Shepherd Decl. (ECF No. 17-12) ¶ 5; *see also* S. Singh Decl.)

25  [6] Plaintiff also proposed a number of alternative respirators as another possible accommodation.
   However, on review of the evidence provided, the Court is satisfied that Defendant has met their

26  burden in showing that the respirators provided would not be a suitable accommodation as they would
   not meet the safety requirements for usage in a correctional environment.  (*See generally* Weissman

27  Decl. (ECF No. 17-10).)  However, the Court encourages Defendant to continue evaluating alternative
   respirators in the event that one may be suitable, which could obviate the need for other changes that

28  could otherwise be required by this Order.

establish undue hardship "an employer must show that the burden of granting an accommodation would result in *substantial increased costs* in relation to the conduct of its particular business." *Id.* at 470 (emphasis added). The Court advised that undue hardship in the context of Title VII "means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.* at 471. "[C]ourts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Id.* at 470. The Court also noted that to satisfy Title VII, employers cannot simply examine the reasonableness of "a particular possible accommodation or accommodations" but must "reasonably accommodate an employee's practice of religion" which requires consideration of "other options". *Id.* at 473.

Defendant has not met their burden to show that providing reasonable accommodations to the Charging Parties would cause undue hardship. At bottom, Defendant's argument is that because all Correctional Officers can, at any time, be required to work in any section of a prison or in any posting, they thus may need to don a respirator in response to the usage of chemical agents or risk of encountering ATDs. Therefore, Defendant argues all Correctional Officers must be able to use a respirator at all times. As discussed below, however, Defendant has not presented sufficient evidence that it would constitute a substantial burden to exempt the Charging Parties from responding to controlled uses of force and/or prison riots in which chemical agents are used. Moreover, while the Court can envision situations in which it would be an undue hardship to exempt the Charging Parties from wearing a respirator in response to an outbreak of an airborne disease, such as during the recent state of emergency arising from the COVID-19 pandemic, Defendant has not presented evidence of a current or imminent outbreak, or that it would constitute an

14

1  undue hardship to reassign Correctional Officers in the event of a more limited

2  outbreak.

3       Fundamentally, because Defendant has relied on highly generalized arguments

4  that all Correctional Officers must be able to wear a respirator at all times and in all

5  assignments, Defendant has refused to grapple with the specific circumstances of the

6  individual Charging Parties.  Its failure to engage in a meaningful assessment of the

7  options available to accommodate the individual Charging Parties is fatal to its

8  opposition.

9          **i.  Necessity of Universal Respirator Requirement**

10       Plaintiff represents that 590 Correctional Officers previously held religious

11  accommodations from the facial hair requirement.  (Mot. at 9.)  This is only a small

12  percentage of the total Correctional Officer population of over 20,000.[7]  While

13  Defendant may be correct that due to its size and safety concerns CDCR is unique

14  from other penal systems, it is Defendant's burden to show that accommodating such

15  a small fraction of the Correctional Officer population "would result in substantial

16  increased costs in relation to the conduct of its particular business."  *Groff*, 600 U.S. at

17  470.  Defendant's undue hardship argument is mainly based on its present policy that

18  all Correctional Officers be able to don respirators.  However, Defendant has not

19  provided sufficient evidence to establish that all Correctional Officers they employ

20  must be able to use a respirator.

21       Defendant currently requires that all Correctional Officers be able to wear a

22  respirator at all times.  (Opp'n at 2.)  Defendant claims that this universal respirator

23  requirement is necessary due to the usage of chemical agents in CDCR institutions

24  and to protect inmates and CDCR staff from exposure to ATDs.  (*Id.*)  As Defendant

25  notes, Cal/OSHA regulations require that employees who are exposed to chemical

26

27  _____

    [7] Though an exact number has not been provided, at oral argument, Plaintiff represented there are
28  approximately 21,800 Correctional Officers employed by Defendant.  Defendant did not contest the
accuracy of this estimate.

1  agents must be provided with respirators when necessary to protect the health and

2  safety of the employee.  (Savala Decl. (ECF No. 17-4) ¶ 3 (citing Cal. Code. Reg., tit. 8,

3  § 5144).)  Cal/OSHA also requires CDCR to maintain an Aerosol Transmissible

4  Diseases Exposure Control Plan that specifies the job classifications in which

5  employees have occupational exposure to ATDs, and which assignments or tasks

6  require respiratory protection.  (Savala Decl. ¶ 4 (citing Cal. Code Regs., tit. 8, §

7  5199).)  Defendant has designated all Correctional Officers as having exposure to

8  both chemical agents and ATDs.  (Savala Decl. ¶ 8.)

9          For employees exposed to chemical agents or, in certain circumstances, to

10  ATDs, California law requires the use of respirators that meet the requirements of 42

11  C.F.R. pt. 84 and that have been approved for that purpose by the National Institute

12  for Occupational Safety and Health ("NIOSH").  *See* Cal. Code Regs., tit. 8, § 5199(b)

13  (defining respirator); (*see also* Savala Decl. ¶ 4.)  Additionally, due to the type of

14  respirator selected by CDCR, under Cal/OSHA regulations there cannot be facial hair

15  "between the sealing surface of the facepiece and the face or that interferes with valve

16  function."  Cal. Code Regs., tit. 8, § 5144(g)(1)(A); (*see also* Savala Decl. ¶ 12.)

17  Because Defendant has designated all Correctional Officers as being subject to

18  exposure to chemical agents and ATDs, and because the respirator Defendant has

19  selected is not compatible with most types of facial hair, CDCR implemented a policy

20  limiting the facial hair of all Correctional Officers.  (*Id.* at 5.)  Defendant's consistent

21  position has been that no Correctional Officer may wear the kinds of beards that are

22  required by the Charging Parties' faith.

23          No one disputes the importance of protecting Correctional Officers from

24  exposure to chemical agents and ATDs.  As Defendant notes, in addition to the global

25  toll taken by the COVID-19 pandemic of which the Court is painfully aware, within

26  CDCR specifically 49 employees and 263 inmates have died of COVID-19.  (Weissman

27  Decl. ¶ 6.)  Moreover, the Court does not doubt the health impacts on Correctional

28  Officers who are exposed to the concentrations of chemical agents that trigger the

1    required use of a respirator.  If the question was whether requiring Correctional

2    Officers to be exposed to ATD outbreaks and high concentrations of chemical agents

3    without the appropriate use of respirators constituted an undue hardship, the Court

4    would have no hesitation in concluding that it does.  CDCR must be able to operate its

5    prisons in a manner that complies with federal and state law regarding exposure to

6    diseases and harmful chemicals.

7            However, despite claiming that it is necessary for all Correctional Officers to be

8    able to don respirators and relying on the necessity of this policy as a basis to deny

9    the Charging Parties accommodations, Defendant fails to provide evidence

10   establishing that this requirement is truly necessary.  The mere fact of this policy –

11   which was adopted by Defendant as one of a myriad of options to comply with state

12   law – does not establish that it is required nor that deviation from this system would

13   result in substantial increased costs, and thus undue hardship.  Rather than present

14   specific evidence supporting this policy, Defendant only provides conclusory

15   statements suggesting that "it would be impossible for CDCR to adequately staff

16   prisons and respond to emergencies if even one on-duty COs is not able to respond"

17   (*see* Opp'n at 19) and supports this with a few declarations providing similarly

18   conclusory statements (*see, e.g.,* Lemon Decl. (ECF No. 17-15) ¶¶ 12, 16.a).  Based on

19   the evidence provided, it is not apparent that the usage of chemical agents and the

20   risk of ATD exposure justifies the implementation of a respirator requirement for all

21   Correctional Officers.  The Court will examine the types of situations identified by

22   Defendant as those in which a Correctional Officer may be exposed to chemical

23   agents, and then turn to exposure to ATDs.

24                         **a.  Use-of-Force Involving Chemical Agents**

25           One of Defendant's core contentions is that all Correctional Officers must be

26   able to don respirators to respond to use-of-force incidents involving chemical agents

27   at CDCR institutions.  Defendant notes there were over 5,000 uses of chemical agents

28   in CDCR prisons in 2023 (*see* Opp'n at 3).  However, Defendant does not provide any

1    information about the nature of the use-of-force incidents connected with those uses

2    of chemical agents, not all of which require the use of a respirator.

3            Correctional Lieutenant Todd Manes notes that in his personal experience, use-

4    of-force incidents can "range[] from stopping self-harm or simple one on one fights to

5    responding . . . to attempted murders, murders, large-scale fighting and up to Code

6    Three riots[,]" and that in the "vast majority" of these incidents "some form of chemical

7    agent was used." (Manes Decl. (ECF No. 17–14) ¶ 4.)  This illustrates the breadth of

8    situations in which chemical agents might be used and why a generalized claim that

9    chemical agents are used in CDCR institutions does not justify the need for a universal

10   respirator requirement.  When the situations in which chemical agents are used are

11   examined individually, it is apparent why the context for the use-of-force is relevant

12   and why the use of chemical agents in CDCR institutions alone is insufficient to

13   support undue hardship.

14           *First, where the use of chemical agents is in immediate response to a nearby*

15   *inmate disturbance, respirators will not be utilized by Correctional Officers.*  Some

16   portion of the over 5,000 incidents noted by Defendant involve an immediate action

17   by Correctional Officers in response to nearby inmate disturbances such as a fight

18   between two inmates.  (*See* Lemon Decl. ¶ 6.)  As Defendant's counsel conceded at

19   oral argument, where chemical agents are used in that context, a respirator would not

20   be utilized by the Correctional Officer who deployed the chemical agent.  (*See* Manes

21   Decl. ¶ 5 (noting that in the declarant's experience "controlled use-of-force" was the

22   most common reason Correctional Officers would need to use gas masks).)  This is

23   consistent with the Declaration of Gina Savala, who notes that Cal/OSHA has set

24   permissible exposure limits and that chemical agents used in "riot/disturbance control

25   or cell extractions . . . will often fully saturate an environment with one of these

26   chemicals . . . ." (Savala Decl. ¶ 10.)  The implication of her declaration is that there are

27   uses of chemical agents that would *not* result in concentrations of chemicals over

28

1  Cal/OSHA's exposure limits and thus not require respirators,[8] which is in line with

2  counsel's position during argument.  As such, it would be irrelevant if a Correctional

3  Officer deploying a chemical agent in an immediate response situation was unable to

4  wear a respirator.  Thus, this specific kind of usage of chemical agents does not justify

5  the requirement for all Correctional Officers to be able to wear respirators.  And while

6  CDCR does not break down its figure of the 5,000 uses of chemical agents, common

7  sense would suggest that a substantial portion of them constitute this kind of

8  immediate response.

9       *Second, where Correctional Officers are responding after an immediate use-of-*

10  *force, they may need to wear respirators for protection.*  While Defendant's counsel

11  conceded that the rapid deployments of chemical agents discussed previously would

12  not involve the use of a respirator, counsel stressed that the response *after* such a use-

13  of-force would require the use of a respirator.  However, Defendant provides no

14  information on these response scenarios such as the number of Correctional Officers

15  that need to respond in this post-use-of-force context, the posts from which

16  Correctional Officers would respond, the frequency of these incidents, or any other

17  details that would be relevant in determining whether exempting some Correctional

18  Officers from the current universal respirator requirement would create undue

19  hardship.  Similar to the controlled use-of-force incidents discussed next, it seems

20  highly likely that there is at least *some* delay in the response that would allow

21  supervisors to make a decision about who would respond to the incident and who

22  would be assigned to other roles.  Absent information about how these situations

23  unfold, it is impossible for the Court to determine whether the need to respond after a

24  sudden use of chemical agents justifies imposing a respirator requirement on all

25  Correctional Officers.

26

27  _____

   [8] Because of the generalized nature of CDCR's declarations, it is unclear what concentration of chemical
   agents occurs during an immediate response to an inmate disturbance, but it is clear that respirators
28  are not used during this kind of immediate response.

*Third, in "controlled use-of-force" incidents such as cell extractions, the response is planned, allowing flexibility in determining which Correctional Officers are involved.* Respirators are most often necessary when chemical agents are deployed in the controlled use-of-force context (e.g., cell extractions). (*See* Manes Decl. ¶ 5.) Notably, this is the usage of chemical agents for which Defendant has significant flexibility in how Correctional Officers are assigned. Defendant relies heavily on the declaration of Correctional Lieutenant Manes in discussing the use of chemical agents and respirators in CDCR institutions. During the 16 years he has been posted at California State Prison, Sacramento, the only times that Correctional Lieutenant Manes donned a gas mask was during controlled use-of-force incidents.[9] (Manes Decl. ¶ 5.) Significantly, despite stating that he has "responded to approximately 200 incidents where force was use [sic]" and that "some form of chemical agents was used" during the "vast majority" of these incidents[10], Correctional Lieutenant Manes notes that the only time he needed to wear a respirator was in controlled use-of-force incidents at California State Prison, Sacramento, and one other time in response to a riot at Salinas Valley State Prison. (*Id.* ¶¶ 4–5.) Correctional Lieutenant Manes also states that in

---

[9] Specifically, Lieutenant Manes states: "In my career, I have much experience with COs using (and requirements for using) tight-fitting respirators with face seals (aka "gas masks") when chemical agents are used. For example, SVSP issued gas masks to the employees, while other prisons have gas masks located at centralized locations to be used when needed. During my time working at SVSP, I donned my gas mask one time during a riot that happened in the gym and involved a large amount of chemical agents deployed to restore order. The gas mask made it easier and safer to perform my duties during the riot, because I was not affected at all by the chemical agents, which can cause debilitating effects, as discussed below. At CSP-SAC, masks were available in the control booths or facility control areas. There, the times that I donned a gas mask was during controlled use of force (e.g., during a cell extraction to move a combative inmate out of the cell) where chemical agents were being utilized. That is the most common reason that most of the staff at CSP-SAC use gas masks. And, at times during bigger riots, I observed staff using a gas mask when areas were saturated with chemical agents." (Manes Decl. ¶ 5.)

[10] Correctional Lieutenant Manes states: "In my career I have been involved in approximately 200 incidents where force was use, as either an onsite responder, Code One, Code Two, or Code Three responder, Response Supervisor, or Incident Commander. These incidents ranged from stopping self-harm or simple one on one fights, to responding with use of force to attempted murders, murders, large-scale fighting, and up to Code Three riots (involving 100 or more people engaged in violence). In the vast majority of the force used during all these incidents some form of chemical agents was used. At CDCR, we teach COs that distance is safety, and using chemical agents can allow COs to begin effective use of force at a distance." (Manes Decl. ¶ 4.)

responding to these incidents supervisors will form a "response team" which involves "select[ing] available COs for assignment from an array of CO posts . . . ." (Manes Decl. ¶ 3.)

The Court does not doubt that the use of respirators in these circumstances is critical and required by state law.  However, Defendant has not established that it would be an undue hardship to not assign individuals who are unable to wear respirators for religious beliefs to controlled use-of-force incidents.  As the name suggests, these situations appear to be at least somewhat "controlled".  Correctional Officers are "called on to participate" in these incidents and redirected from another post to assist. (Lemon Decl. ¶ 6.)  The formation of a response team, as was mentioned by Correctional Lieutenant Manes, means that supervisors have the capacity to select, or not select, Correctional Officers for involvement.[11]  Those not selected would have no need to wear respirators.  Thus, the usage of chemical agents in the controlled use-of-force context cannot be used to justify the requirement that all Correctional Officers be able to wear a respirator.

*Fourth, though a large number of Correctional Officers may be required to don respirators when riots occur, these incidents appear rare, and, similar to controlled use-of-force incidents, their response is at least somewhat planned*.  Defendant argues that during a large-scale riot, chemical agents would be used and a significant number of Correctional Officers would be required to respond, many of whom would be exposed to chemical agents and required to don a respirator.  Again, however, Defendant fails to offer any information indicating how often these large-scale incidents happen, how many Correctional Officers may be impacted, or what other assignments may exist for Correctional Officers during these kinds of events.

Indeed, the evidence suggests these events are rare, such that it would not be an undue hardship to ensure that individuals who cannot use respirators for religious

---

[11] There is no indication that these response teams are chosen based on seniority.

1   purposes are assigned different tasks that would not require them to use a respirator

2   during such an event.  For instance, despite being provided by Defendant as the

3   primary declarant on the need for respirators during use-of-force incidents involving

4   chemical agents and working in CDCR institutions for roughly 19 years, Correctional

5   Lieutenant Manes has worn a respirator _one time_ in connection with a riot.  (Manes

6   Decl. ¶¶ 1, 5.)  Similarly, Charging Party Ali, in his six years as a Correctional Officer,

7   has _never even heard_ a code 3 incident (i.e., a riot) called.[12]  (Ali Decl. ¶¶ 22–23.)  And

8   Correctional Officer Quattrone, who has been employed as a peace officer with CDCR

9   for eight years, has never worn a gas mask-type respirator as part of his duties.

10  (Quattrone Decl. ¶ 17.)

11       As in the cell extraction context, the response to riots also appears to be

12  organized, with Correctional Officers redirected from other posts to assist with riot

13  control and formed into a "riot-response team".  (Lemon Decl. ¶¶ 6, 9; Manes Decl.

14  ¶ 7.)  All the information provided by Defendant suggests that these incidents are rare

15  and, when they do occur, there are still Correctional Officers at the institution who do

16  not need to wear respirators.  (_See_ Manes Decl. ¶ 12 (stating that there are posts, such

17  as "outer-perimeter gun posts or tower posts" that are not "exposed to chemical

18  agents during the usual course of their duties"); _see also_ Ali Decl. ¶ 25 ("I am aware of

19  peace officer work assignments at CHCF where officers are never required to respond

20  to incidents that require a gas mask.  These positions may be in certain

21  areas . . . where officers are not allowed to leave their post to respond to code 3

22  incidents.").)  Defendant has not given sufficient evidence that providing

23  accommodations to the limited number of Correctional Officers who previously

24  sought them would jeopardize the ability of institutions to respond to riots.  As such, it

25  is not apparent that the potential for riot response justifies Defendant's requirement

26  that all Correctional Officers be able to safely wear respirators.

27  _____

28  [12] Significantly, Officer Ali has also never been called upon to assist with a code two incident, which includes some cell extractions.  (Ali Decl., ¶¶ 22–23.)

1                                    *       *       *       *

2          In the context of chemical agents used in connection with a use-of-force

3   incident, Defendant has not established that its requirement that all Correctional

4   Officers be required to wear a respirator is justified.  In situations where chemical

5   agents are deployed, either respirators would not be used or the use-of-force is

6   planned such that some Correctional Officers at the institution would not be required

7   to wear a respirator.  Defendant has not presented evidence that shows there are

8   situations where all Correctional Officers need to be able to don respirators.  Thus, the

9   presence of a universal respirator requirement is not justified by the use of chemical

10  agents and, as such, deviation from that requirement would not establish a substantial

11  increase in cost such that it would constitute an undue hardship.

12                          **b.  Aerosol Transmissible Diseases**

13         Undoubtedly, Defendant's renewed emphasis on complying with Cal/OSHA

14  regulations governing the use of respirators, resulting in the recission of the religious

15  and medical accommodations that had previously been afforded the Charging

16  Parties, was a direct result of CDCR's experiences during the COVID-19 pandemic.  As

17  stated above, Defendant has a significant interest in ensuring that its employees and

18  inmates are not exposed to Aerosol Transmissible Diseases which the use of

19  respirators is designed to prevent.  However, Defendant's claim that a *universal*

20  respirator requirement is justified by the need to respond to outbreaks of ATDs in

21  CDCR institutions and the wider community is unsupported by the evidence

22  presented.

23         N-95 respirators[13] are not used by Correctional Officers in the standard day-to-

24  day operations of CDCR institutions.  (*See* Lemon Decl. ¶¶ 12, 16; Dhillon Decl. ¶ 15;

25  Pannu Decl. ¶ 28.)  The use of these respirators appears generally limited to "various

26  _____

27  [13] The gas-mask style respirators used to protect Correctional Officers from chemical agents differ in
    function from the N-95 respirators used to prevent exposure to ATDs.  (*See* Savala Decl. ¶ 8.)  However,
28  both respirator types are affected by Cal/OSHA guidelines on the sealing of respirators and facial hair.
    (*Id.* ¶ 12.)

                                              23

circumstances and assignments" where contact with inmates with ATDs is necessary or when a Correctional Officer is in a medical setting such as a hospital or clinic.  (Lemon Decl. ¶ 12; *see* Pannu Decl. ¶ 28; Quattrone Decl. ¶ 18; Sohal Decl. ¶ 14.)  As stated by CDCR Deputy Director of the Office of Employee Health Management Randolph Weissman, "CDCR adopted a policy . . . to require that every CO be able to wear a tightfitting respirator *in an ATD-exposure environment* . . . ." (Weissman Decl. ¶ 7 (emphasis added).)  The evidence presented by Defendant appears to indicate that these ATD-exposure environments are limited to specific locations and duties within individual institutions.  Defendant has not explained why every Correctional Officer must be able to work in these environments.  While it would certainly be administratively easier for Defendant to not have to consider who can and who cannot work in an ATD-exposure environment, administrative inconvenience does not constitute an undue hardship.

Though Defendant partially relies on their settlement with Cal/OSHA and subsequent approval of CDCR's ATD Exposure Control Plan as justification for the requirement that all Correctional Officers be able to wear respirators in ATD-exposure environments, Defendant states that the settlement "required that prison staff *with occupational risks of exposure to ATDs* be respirator-fit tested and wear tight-fitting respirators . . . ." (Opp'n at 3 (emphasis added).)  It appears that as part of Defendant's Agreement with Cal/OSHA, Defendant was required to assess and identify specific activities where Correctional Officers would face exposure to ATDs.  (Savala Decl. ¶ 7.)  It also appears that many, if not all, institutions were required to develop their own ATD Exposure Control Plan specific to the needs of the individual institution.  (Savala Decl. ¶¶ 6, 7.)  Defendant, however, decided that it would designate *all* Correctional Officers as facing exposure to ATDs.  While Cal/OSHA approved this designation, there is no information in the record to suggest that Cal/OSHA required this specific

////

////

24

designation, or that that law requires it.[14]  Specifically, Defendant has provided no

justification why Correctional Officers not located in specific ATD-exposure

environments or with no risk of exposure to ATDs would need to comply with the

respirator requirement.  Although Defendant contends that "COs *may* be tasked with

working around and transporting inmates with ATDs[]" (Opp'n at 6 (emphasis added))

and thus need to be able to wear a respirator, this reasoning is conclusory and does

not provide any meaningful justification for why every Correctional Officers must be

able to perform these tasks.  Defendant fails to provide evidence as to why exempting

---

[14] Defendant cites three regulatory provisions as requiring the ATD Exposure Control Plan and the Respiratory Protection Program as adopted by CDCR, Sections 5199, 5144 and 3203 from Title 8 of the California Code of Regulations.

Section 5199 concerns ATDs and required protection policies and procedures in various settings.  *See* Cal. Code Regs., tit. 8, § 5199.  The Declaration of Gina Savala, provided by Defendant, only states that CDCR could face fines under Section 5199 if CDCR stopped enforcing fit testing requirements for employees.  (Savala Decl. ¶ 14.)  Subsection (g)(4) describes the times an employee must wear a respirator.  *See* Cal. Code Regs., tit. 8, § 5199(g)(4).  These include where the employee:
(A) Enters an [Airborne Infection Isolation] room or area in use for [Airborne Infection Isolation];
(B) Is present during the performance of procedures or services for an [Airborne Infectious Disease] case or suspected case;
(C) Repairs, replaces, or maintains air systems or equipment that may contain or generate aerosolized pathogens;
(D) Is working in an area occupied by an [Airborne Infectious Disease] case or suspected case, during decontamination procedures after the person has left the area and as required by subsection (e)(5)(D)9;
(E) Is working in a residence where an [Airborne Infectious Disease] case or suspected case is known to be present;
(F) Is present during the performance of aerosol generating procedures on cadavers that are suspected of, or confirmed as, being infected with aerosol transmissible pathogens;
(G) Is performing a task for which the Biosafety Plan or Exposure Control Plan requires the use of respirators; or
(H) Transports an [Airborne Infectious Disease] case or suspected case within the facility or in an enclosed vehicle (e.g., van, car, ambulance or helicopter) when the patient is not masked.
*Id.*  None of these bases appears, on their own, to require all Corrections Officers to be able to don respirators except to the extent that these tasks are designated as requiring a respirator in the Exposure Control Plan.  The Court notes that subsection (d), which provides guidance on Exposure Control Plans, only generally provides that the plan should provide "[a] list of all job classifications in which employees have occupational exposure" without any further requirement as to what those positions entail.  Section 5199(a)(1)(E) does also identify "Correctional facilities and other facilities that house inmates or detainees" as having an *increased* risk for transmission of ATDs, but the regulation provides no indication that this designates all Correctional Officers as facing exposures to ATDs.

Section 5144 discusses respiratory protection, requires employers to implement a respiratory protection program, and imposes requirements for the selection, usage, and implementation of respirators in the workplace.  *See* Cal. Code Regs., tit. 8, § 5144.  No portion of Section 5144 requires certain employees to be designated as at risk for ATD exposure.  *See id.*  Similarly, nothing in Section 3203, which concerns the implementation of an Injury and Illness Prevention Program, requires such designations.  *See* Cal. Code Regs., tit. 8, § 3203.

1    some Correctional Officers from working in these ATD-exposure environments would

2    present an undue hardship.

3           Defendant raises concerns about situations where outbreaks in a CDCR

4    institution or the surrounding community would necessitate a warden mandating

5    respirators for all Correctional Officers at a specific institution.  In that scenario,

6    permitting a Correctional Officer to not be in compliance with the facial hair policy

7    might present an undue hardship.  However, the specter of such an outbreak, without

8    more, is insufficient to establish that all Correctional Officers must be able to wear

9    respirators at the present time.  Were that situation to arise, Defendant would be able

10   to engage in an individualized assessment of the available options to accommodate

11   those requesting religious exemptions and whether providing an accommodation in

12   that circumstance would cause undue hardship.  As it stands, Defendant has

13   presented no evidence that this is a present issue for any institution, let alone those

14   where the Charging Parties are located.

15                    **ii.  Seniority and Impacts on Co-Workers**

16                          **a.  The Seniority System Does Not Establish Undue Hardship**

17          While Defendant argues that an alteration to the respirator requirement would

18   result in a violation of the seniority system in place at CDCR as part of the collective

19   bargaining agreement, Defendant fails to show that full compliance with the seniority

20   system and providing reasonable accommodations to the Charging Parties are

21   mutually exclusive.  The Supreme Court has held that Title VII does not require an

22   employer to "carve out a special exception to its seniority system" in order to

23   accommodate an employee where doing so would violate the collective bargaining

24   agreement.  *See Trans World Airlines, Inc v. Hardison*, 432 U.S. 63, 83 (1977).

25   However, *Trans World Airlines* does not stand for the proposition that where a

26   seniority system is in place, reasonable accommodations cannot be provided.  In

27   *Trans World Airlines*, the individual requesting a religious accommodation worked in a

28   role that needed to always be filled, even at the expense of other duties.  *Id.* at 66–67.

The individual was denied an accommodation when he requested time off to observe the sabbath as "[his] job was essential and on weekends he was the only available person on his shift to perform it." *Id.* at 68.  The Court found that the employer "could not be faulted" for failing to find an accommodation for the individual as doing so would have necessarily required violating the collective-bargaining contract and the seniority rights of other employees. *Id.* at 78–79.

Defendant has not presented evidence that providing religious accommodations to the facial hair requirement would necessarily require violating the seniority system in place for Correctional Officers.  In the chemical agent context, the evidence provided by Defendant only establishes that respirators are utilized in controlled use-of-force and riot contexts where supervisors select response teams.  As noted by the declarations provided by Defendant, "response supervisors" pull Correctional Officers from other postings to respond.  (*See* Manes Decl. ¶¶ 3, 6; Lemon Decl. ¶ 6.)  There is no indication in the declarations submitted by Defendant that this selection is based on the seniority system.

In regard to ATDs, the evidence presented shows that outside of specific outbreaks, the roles and locations where masking is typically required are limited. (*See Id.* ¶ 12; *see also* Pannu Decl. ¶ 28; Quattrone Decl. ¶ 18; Sohal Decl. ¶ 14.) These postings are presumably subject to the seniority system, meaning that Correctional Officers already know when choosing to avoid or fill those roles that a respirator will be required.  While a less senior Correctional Officer might be required to fill one of these roles despite not wishing to, in which case an accommodation might not be available for that specific officer, the fact that these roles exist and are subject to the seniority system does not mean that *all* Correctional Officers and *all* positions must be subject to this same requirement.[15]

---

[15] As discussed below, part of the issue is that CDCR has not actually engaged individual employees in an interactive process on an individualized basis, but rather has denied any accommodation within the Correctional Officer role as a blanket policy.  As such, it is unknown whether individual employees cannot be accommodated due to their lack of senior status.

1    Additionally, the Supreme Court's decision in *Trans World Airlines* was based in

2  part on the fact that the union that had agreed to the seniority system "was unwilling

3  to entertain a variance over the objections of men senior to Hardison[.]"  *Id.* at 79.  The

4  Court specifically noted that the employer in *Trans World Airlines* had sought a

5  variance from the collective bargaining agreement from the union to accommodate

6  the employee over the objections of his co-workers.  *Id.* 78–79.  Here, Defendant has

7  presented no evidence that they have communicated with the Charging Parties' union

8  to determine if the union would be willing to agree to a variance from the current

9  seniority system to accommodate the Charging Parties.  While such an effort might

10  ultimately be rejected, a showing of undue hardship requires that the employer assess

11  more than "the reasonableness of a particular possible accommodation or

12  accommodations" but consider "other options" to accommodate employees.  *Groff*,

13  600 U.S. at 473.

14    Importantly, Defendant has provided limited to no detail about how the

15  seniority system functions both in theory and in practice.  Deputy Associate Director of

16  CDCR's General Population Males Mission, Tristan Lemon, indicates that CO posts are

17  allocated in two ways with the first being a "bid process" where posts are awarded

18  based on seniority and mandatory overtime is assigned based on reverse seniority if

19  there are no volunteers.  (Lemon Decl. ¶ 13.)  But, beyond this information, there is

20  little detail provided about how the seniority system functions.  Defendant provides no

21  information about the number of bids received for specific positions, the frequency

22  with which new positions become available, or at what level of granularity the seniority

23  system operates.  Moreover, in addition to the seniority system, Correctional Officers

24  can be assigned to certain "management posts," which are not based on seniority but

25  rather on the needs of specific areas of the prison, as determined by supervisors.  (*Id*.

26  ¶ 14.)  Defendant provides no information regarding how many or what type of

27  positions are governed by this alternative selection process.  Defendant includes even

28  less information on the overtime process and the usage of reverse seniority when that

1   system applies.  The lack of information makes it impossible for the Court to assess

2   whether it would be impossible to provide religious accommodations from the facial

3   hair requirement without violating the seniority system in place.

4          Defendant's contention that providing religious accommodations from the

5   facial hair requirement would violate the seniority system is ultimately unsupported by

6   the evidence.  While it would be an undue hardship to require accommodations that

7   would violate the collective bargaining agreement, the evidence does not suggest

8   that accommodating the Charging Parties' religious beliefs would necessarily do so.

9                      **b.  Impacts on Other Co-Workers**

10         At oral argument, Defendant also argued that accommodating the Charging

11  Parties' requests would result in undue hardship as it would necessitate the Charging

12  Parties' co-workers to take additional overtime and potentially more dangerous tasks.

13  Counsel contended that *Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1384 (9th Cir.

14  1984), prohibits such an accommodation under Title VII.  However, *Bhatia* is a pre-

15  *Groff* case and expressly applies the "de minimis" standard that *Groff* later rejected.

16  *Id.*  Accordingly, it is of little value.

17         Further, in *Groff*, the Supreme Court cautioned against considering the impact

18  of a religious accommodation on other employees stating:

19                 Title VII requires that an employer reasonably
                   accommodate an employee's practice of religion, not
20                 merely that it assess the reasonableness of a particular
                   possible accommodation or accommodations. This
21                 distinction matters. Faced with an accommodation request
                   like Groff's, **it would not be enough for an employer to**
22                 **conclude that forcing other employees to work**
                   **overtime would constitute an undue hardship**.
23                 Consideration of other options, such as voluntary shift
                   swapping, would also be necessary.
24

25

26  *Groff*, 600 U.S. at 473 (emphasis added and internal citations removed).  The Court

27  also noted that "not all impacts on coworkers are relevant, but only coworker impacts

28  that go on to affect the conduct of the business."  *Groff*, 600 U.S. at 472 (cleaned up).

It is undoubtedly the case that performing a cell extraction is more dangerous than working overtime generally, and the Court does not minimize those risks. However, unlike the cases related to COVID-19 cited by the Defendant (Opp'n at 20 (citing *Bordeaux v. Lions Gate Ent., Inc.*, --- F. Supp. 3d ---, 2023 WL 8108655, at *13 (C.D. Cal. Nov. 21, 2023))) in which the risk was unrelated to the job for which the individual was hired, here tasks like cell extractions are an expected part of the job of a Correctional Officer.  An employee doing more of a portion of his job so that the employer can accommodate a religious observance is not inherently an undue hardship.  While it *could be* an undue hardship if the amount of work being shifted to other employees was sufficiently significant to affect the conduct of Defendant's business, *see Groff*, 600 U.S. at 472, Defendant presents absolutely no evidence as to the scale of that shifted work or the subsequent impact on CDCR's operations.

### iii. Individual Assessment of Accommodations

Beyond the more generalized arguments of undue hardship, there is no indication that Defendant ever performed an individualized assessment for any of the Charging Parties to determine if they could be accommodated in their specific role at the institution in which they were posted.  The Supreme Court's ruling in *Groff* is clear that before declaring that providing an accommodation for an employee's religious beliefs creates an undue hardship, an employer must consider other options, not simply assess "the reasonableness of a particular possible accommodation or accommodations."  600 U.S. at 473.  Defendant's opposition is focused on universal, state-wide changes to policy.  Title VII, by contrast, makes it an unlawful employment practice for an employer to "discharge any *individual*, or otherwise discriminate against any *individual* . . . because of such *individual's* . . . religion."  42 U.S.C. § 2000e-2(a)(1) (emphasis added).  Likewise, the employer's duty to show undue hardship is focused on the individual employee's religious observance or practice.  *See* 42 U.S.C. § 2000e(k).

1         Moreover, which accommodations are available and what would constitute an

2  undue hardship naturally depends upon the specific circumstances of the individual

3  Correctional Officer.  For example, the declarations provided by two of the Charging

4  Parties state that the individuals in question had never needed to wear a respirator as

5  part of their job duties during their eight and six years of respective employment.

6  (Quattrone Decl. ¶ 17; S. Singh Decl. ¶ 15.[16])  Despite the fact that these Charging

7  Parties had never needed to don a respirator, Defendant still denied their requests for

8  accommodations and there is no evidence that there was a meaningful investigation

9  of the ability to do so.  With respect to COVID-19, most of the Charging Parties note

10  that N-95 respirators are only currently required in "quarantine" areas of their

11  institutions.  (*See, e.g.*, Pannu Decl. ¶ 28; Quattrone Decl. ¶ 18; Sohal Decl. ¶ 14.)  And

12  there is at least some suggestion that certain institutions may have special teams that

13  respond to incidents requiring the use of chemical gases.  (Pannu Decl. ¶ 29.)  Despite

14  this, Defendant universally denied each of the Charging Party's requests to be

15  exempted from the facial hair policy, and instead provided the purported

16  accommodation of transfer/reassignment or demotion.

17         "Title VII requires that an employer reasonably accommodate an employee's

18  practice of religion, not merely that it assess the reasonableness of a particular

19  possible accommodation or accommodations."  *Groff*, 600 U.S. at 473.  The evidence

20  presented suggests that Defendant did not consider other available options for the

21  individuals before it, and thus did not meet its duty to reasonably accommodate each

22  Charging Party.  As such, it is improper for Defendant to conclude that it would be an

23  undue hardship to accommodate the Charging Parties.

24  ////

25  ////

26

---

27  [16] As it appears Charging Party S. Singh has been terminated for unrelated reasons, Defendant likely no
longer needs to investigate reasonable accommodations for that individual.  However, the facts prior to
28  his termination remain illustrative for this point.

1                                    *      *      *      *

2          To summarize, Defendant has not presented sufficient evidence from which the

3   Court can find that providing religious accommodations to the Charging Parties

4   would create an undue hardship.  While *Groff* does not articulate an exact standard, it

5   does state that to establish undue hardship "an employer must show that the burden

6   of granting an accommodation would result in substantial increased costs in relation

7   to the conduct of its particular business."  *Groff*, 600 U.S. at 470.  Defendant has not

8   presented evidence to meet this standard.

9          Accordingly, Plaintiff has established a likelihood of success on the merits as

10  they can establish a prima facia Title VII case and Defendant has not shown that they

11  provided reasonable accommodations or that providing accommodations would

12  create an undue hardship.

13  **II.      Irreparable Harm**

14         Under the traditional *Winter* factors, to obtain preliminary relief a Plaintiff must

15  show that "irreparable injury is likely" in the absence of such relief.  *California v. Azar*,

16  911 F.3d 558, 581 (9th Cir. 2018).  The injury must be immediate, not a speculative

17  future injury.  *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.

18  1988).  "Irreparable harm is . . . harm for which there is no adequate legal remedy,

19  such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068

20  (9th Cir. 2014).

21         Here, the irreparable harm is evident.  The Charging Parties requested

22  accommodations so that they could freely practice their religious beliefs.  Instead of

23  providing reasonable accommodations or actually assessing whether providing

24  accommodations for the Charging Parties would be an undue hardship, Defendant

25  denied these requests on the basis of a self-imposed requirement that all Correctional

26  Officers be able to wear respirators.

27         As a result of Defendant's seeming unlawful employment practices, the

28  Charging Parties were forced to violate tenants of their faith to continue their

1    employment.  (Ali Decl. ¶ 27; Dhaliwal Decl. ¶ 19; Dhillon Decl. ¶ 16; Pannu Decl.

2    ¶ 30; Quattrone Decl. ¶ 19[17]; R. Singh Decl. ¶ 9; S. Singh ¶ 17;[18] Sohal ¶¶ 13, 20.)

3    According to the Charging Parties, the inability to maintain a beard as part of their

4    religious practices has had severe negative effects on their lives and emotional states.

5    The Charging Parties describe feelings of humiliation and shame (Sohal Decl. ¶ 21.a;

6    Quattrone Decl. ¶ 19.a; R. Singh Decl. ¶ 25.a; S. Singh Decl. ¶ 19.a), loss of connection

7    with their faith and community (Sohal Decl. ¶ 21.b; R. Singh Decl. ¶¶ 25.b, 25.d; S.

8    Singh ¶ 19.c), loss of identity (Ali Decl. ¶ 29.b; Dhaliwal Decl. ¶ 20.a), a sense of

9    isolation (Ali Decl. ¶ 29.d; Quattrone Decl. ¶ 19.c), feelings of dishonor (Ali Decl.

10   ¶ 29.b), and more.  Most, if not all, of these effects are non-monetary injuries in the

11   form of emotional, psychological, and spiritual harms.  Emotional and psychological

12   harms are recognized by the Ninth Circuit as being irreparable.  *Chalk v. U.S. Dist. Ct.*

13   *Cent. Dist. of Cal.*, 840 F.2d 701, 710 (9th Cir. 1988).  Though in substantially different

14   circumstances involving distinct claims, the Supreme Court has also recognized that

15   "[t]he loss of First Amendment freedoms, for even minimal periods of time,

16   unquestionably constitutes irreparable injury."  *Roman Cath. Diocese of Brooklyn v.*

17   *Cuomo*, 592 U.S. 14, 19 (2020).

18          Defendant contends that the Charging Parties are not suffering irreparable

19   harm because they are "in control" of their situation as they can accept non-Peace

20   Officer positions or stop working.  (Opp'n at 23–24.)  However, Defendant has

21   presented no authority that suggests that the Charging Parties must accept lesser

22   roles (or worse termination) when offered them and thereby knowingly inflicting a

23   separate set of harms on themselves.  Moreover, and perhaps most importantly, such

24   a rule would functionally eliminate Section 706(f)(2).   An employer offering an

25

26   [17] Unlike the declarations submitted by other Charging Parties, Charging Party Quattrone's declaration
     does not clearly state that Charging Party Quattrone is continuing to shave but it does indicate that this
27   is the case.  (*See* Quattrone Decl. ¶ 19.)

28   [18] As Charging Party S. Singh was terminated from employment with CDCR several months prior to this
     action being filed, it is not apparent that Charging Party S. Singh personally faces irreparable harm.

1   alternative position – no matter how substantial the demotion or change in

2   employment status – would prevent the EEOC from obtaining preliminary relief as

3   permitted by Section 706(f)(2) because the employee could accept that position and

4   thus suffer only monetary injury.  Worse, an employee can *always* leave their position.

5   Thus, for this Court to hold that irreparable harm is not present because the Charging

6   Parties could simply leave their jobs would mean that preliminary relief under Section

7   706(f)(2) to prevent the harms of unlawful employment practices is, in reality, *never*

8   available.  Congress expressed a clear intent to provide an avenue for preliminary

9   relief by including this provision, and the Court declines the invitation to effectively

10  read that statute out of existence through a wooden application of the *Winter* factors.

11          Given the above, it is clear that Plaintiffs have suffered and continue to suffer

12  irreparable injury as a result of Defendant's failure to comply with the requirements of

13  Title VII.

14  **III.    Balance of Equities**

15          In determining the balance of equities, a court must "balance the interests of all

16  parties and weigh the damage to each."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109,

17  1138 (9th Cir. 2009) (internal citations and quotations omitted).  On the evidence

18  before the Court, the ongoing harm to the Charging Parties outweighs the harm to

19  Defendant in granting this motion.  Congress permitted the usage of preliminary relief

20  in Title VII actions as a way to preserve the status quo pending the resolution of

21  administrative proceedings.  *See Pac. Press Pub. Ass'n*, 535 F.2d at 1187.  Granting

22  preliminary relief will ensure that the Charging Parties' rights are protected until the

23  EEOC issues a final disposition of the charges before them.

24          Defendant argues that granting Plaintiff's Motion would "create an unsafe

25  environment in its prisons and endanger the health and safety of prison workers and

26  inmates[,]" as well as increase costs "which ultimately California's taxpayers would

27  bear." (Opp'n at 23.)  As noted above in the discussion of undue hardship, Defendant

28  has failed to support this argument beyond circular statements and provides no

1    concrete information as to how CDCR would be harmed if it were to grant

2    accommodations to the Charging Parties.  These harms balance weakly against the

3    harm to the Charging Parties' constitutional rights, especially given Plaintiff's apparent

4    likelihood of success.

5           The Court is cognizant of the unique position occupied by correctional

6    institutions such as CDCR.  As the Supreme Court has noted, prison administrators are

7    "accorded wide-ranging deference in the adoption and execution of policies and

8    practices that in their judgment are needed to preserve internal order and discipline

9    and to maintain institutional security."  *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  On

10   this basis, courts generally maintain a posture of deference to prison officials as they

11   are experts within their domain and because "operation of . . . correctional facilities is

12   peculiarly the province of the Legislative and Executive Branches of our Government,

13   not the Judicial."  *Id.* at 548.

14          Here, however, the latter basis for deference is undercut by the fact that the

15   party in opposition to CDCR is also an executive branch entity that is specifically

16   empowered by the legislature to prevent discrimination.   Moreover, that the

17   Defendant is afforded deference does not mean that Defendant can avoid its burden

18   to show it provided reasonable accommodations or that providing such

19   accommodations would represent undue hardship.  Even afforded the full deference

20   typically granted to correctional institutions, Defendant has failed to provide sufficient

21   evidence to show that it provided reasonable accommodations for the Charging

22   Parties or that providing reasonable accommodations would create an undue

23   hardship.

24          Given the above, the balance of equities weighs strongly in favor of granting

25   Plaintiff's Motion.

26   ////

27   ////

28   ////

**IV.    Public Interest[19]**

The public interest weighs in favor of granting Plaintiff's Motion.  "[T]he EEOC is not merely a proxy for victims of discrimination, but acts also to vindicate the public interest in preventing employment discrimination." *EEOC v. Federal Exp. Corp.*, 558 F.3d 842, 852 (9th Cir. 2009) (internal citations and quotations removed); *see Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 324 (1980) ("When the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination.").  "(C)laims under Title VII involve the vindication of a major public interest . . . ." *Franks v. Bowman Transport Co.*, 424 U.S. 747, 778 n.40 (1976) (quoting Section-By-Section Analysis, accompanying the Equal Employment Opportunity Act of 1972 Conference Report, 118 Cong. Rec. 7166, 7168 (1972)).

Here, the EEOC has acted, in accordance with its mandate, to prevent potential discrimination.  While the EEOC has not made a final determination, the filing and pursuit of Title VII claims still vindicates an important public interest in preventing discrimination.  *See Franks*, 424 U.S. at 778 n.40.  Moreover, while Plaintiff may not have brought free exercise claims on behalf of the charging parties (*see* Reply at 15 n.2), as noted by Plaintiff, the allegations implicate constitutional rights (*see* Mot. at 24) and it is in the public interest to protect against violations of constitutional rights, *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022).

On the issue of public interest, Defendant only briefly mentions the need to maintain workplace safety, especially given that CDCR institutions are responsible for the safety of both its employees and inmates.  (Opp'n at 21.)  The Court is sensitive to the safety concerns mentioned.  However, as noted above, Defendant has not provided evidence to justify the respirator requirement on any basis, including on

---

[19] While the general rule is that "[w]hen the government is a party [to litigation], [the] last two [*Winter*] factors merge," *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), the fact that *both* parties here are government entities makes the application of this rule less clear.  The Court therefore considers the balance of equities and the public interest separately, though they ultimately overlap.

1   grounds of employee and inmate safety.  As such, a generalized safety concern is

2   insufficient to outweigh the strong public interests in favor of granting Plaintiff's

3   Motion.

4        Accordingly, granting Plaintiff's Motion appears to be in the public interest and

5   this factor weighs in favor of granting Plaintiff's Motion.

6                              **CONCLUSION**

7        As determined above, each of the *Winter* factors weighs in favor of granting

8   Plaintiff's Motion.  Accordingly, the Court GRANTS Plaintiff's Motion for a Preliminary

9   Relief pending the EEOC's resolution of the claims brought by the Charging Parties in

10  this case.

11       For the reasons stated, IT IS HEREBY ORDERED that:

12  1.  Plaintiff's Motion for Preliminary Relief (ECF No. 8) is GRANTED;

13  2.  Defendant is ordered to comply with the Preliminary Injunction being

14      simultaneously filed with this Order (ECF No. 33); and

15  3.  The parties are ordered to file a Joint Status Report within 14 days of the

16      EEOC's resolution of the claims brought by the Charging Parties.

17

18  Dated:  June 20, 2024

19                              THE HONORABLE DANIEL J. CALABRETTA
                                UNITED STATES DISTRICT JUDGE
20

21

22

23

24

25

26

27

28

                                       37